

**SIGNED this 21st day of January, 2016.**

_____
**TONY M. DAVIS
UNITED STATES BANKRUPTCY JUDGE**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 15-10214-tmd |
| | § | |
| TRACY ERIN KARLINGER-SMITH | § | |
| SCOTT DAVIS SMITH | § | CHAPTER 7 |
|    Debtors. | § | |

## MEMORANDUM OPINION

Can wage-earners who have sought refuge from creditors, and a fresh start, by filing a chapter 7 liquidation be forced into a chapter 11 reorganization, and be compelled to repay creditors in a five-year plan? In general, yes. But not here, where the Debtors have made extensive and diligent efforts—over a period of seven years—to repay creditors prior to bankruptcy, only to run into one implacable creditor, and where the Debtors have timely paid their taxes and secured creditors.

1

I.  **BACKGROUND AND FACTS**

By most measures, Tracy Karlinger-Smith and Scott Smith (the "Debtors") are models of financial responsibility. Despite their above median take-home income, the Debtors maintain a reasonable budget for their family of four that is mostly within the IRS National and Local Standards.[1] Their only material deviations from the IRS Standards are tuition for a religiously-affiliated private school and extracurricular activity expenses for their two teen-aged sons.[2] After accounting for their expenses and secured debt payments, the Debtors' take-home pay leaves a monthly disposable income of $2,762.[3] Using this disposable income, the Debtors diligently attempted to satisfy their creditors. Usually, mixing adequate income, moderate expenses, and manageable debt with genuine effort to pay creditors is not a recipe for bankruptcy. So why are the Debtors before this Court?

**A. The path to bankruptcy begins with Dr. Karlinger-Smith's failing business.**

The Debtors' schedules of assets and liabilities, with two exceptions, reflect nothing out of the ordinary for a Texas family in financial difficulty. They own various exempt assets, including a house, three cars, three dogs, and a cat,[4] and owe on a mortgage, car loans, and credit cards.[5] The first exception is that they owe no priority debt—most cases involve at least some

---

[1] These standards are adopted into the "Means Test" of section 707(b)(2). Even where the Bankruptcy Code does not impose these standards on a debtor's budget, the Court finds them informative of whether particular expenses are reasonable for a debtor facing bankruptcy. *See In re Croft*, 539 B.R. 122, 134 (Bankr. W.D. Tex. 2015).

[2] *In re Karlinger-Smith*, No. 15-10214, ECF 1, at 37 (Schedule J).

[3] *Id.* at 38.

[4] *Id.* at 9-26 (Schedules B, C).

[5] *Id.* at 27 (Schedule D); *In re Karlinger-Smith*, No. 15-10214, ECF 18 (amended Schedule F).

amount of unpaid taxes.[6] The second exception is a substantial business debt owed to Wells Fargo Practice Group,[7] which was incurred in connection with a veterinary hospital venture attempted by Dr. Karlinger-Smith.[8]

Like many new businesses, the veterinary hospital ultimately failed. Shortly after opening in 2003, the hospital was unable to generate enough cash flow to make timely payments on its outstanding debts.[9] For a time, though, the business (or the Debtors) continued to make at least some payments to its various creditors. The Debtors also continued to pay their consumer debts while Dr. Karlinger-Smith drew minimal income in her efforts to steady the hospital's finances. In 2008, however, the Debtors closed the business, and Dr. Karlinger-Smith went to work for a more established veterinary hospital.[10]

But the Debtors did not cut and run on the business debts. Using the services of a credit counseling group, they continued to pay these creditors, and did so at some sacrifice. Indeed, after using their disposable income to pay their creditors "there was usually nothing left at the end of the month."[11] Although the record is not clear regarding the total amount of business debt the Debtors satisfied after closing the hospital,[12] only the Well Fargo debt now remains.[13]

---

[6] *In re Karlinger-Smith,* No. 15-10214, ECF 1, at 28 (Schedule E).

[7] *In re Karlinger-Smith*, No. 15-10214, ECF 18, at 2 (amended Schedule F).

[8] Karlinger-Smith testimony. *See also In re Karlinger-Smith*, No. 15-10214, ECF 19, Ex. A (Wells Fargo state court complaint).

[9] Karlinger-Smith testimony.

[10] *Id.*

[11] Karlinger-Smith testimony.

[12] Dr. Karlinger-Smith testified that there was "hundreds of thousands of dollars" of business debt remaining in 2008.

### B. The Debtors and Wells Fargo were unable to reach an agreement.

The Debtors continued to make payments to Wells Fargo until 2011, when they turned back to the credit counseling group.[14] The group had been successful in settling the Debtors' other business debt, including another business debt owed to Wells Fargo, and so the Debtors hoped the group would be able to devise a similar solution for the remaining Well Fargo debt.[15]

The Debtors then made monthly payments to the credit counseling group. At least some of this money was held in trust by the group while it attempted to negotiate a settlement with Wells Fargo. Although the group proposed several offers to Wells Fargo, and Wells Fargo made at least one counteroffer, no agreement was ever reached.[16]

In January of 2015, Wells Fargo filed a lawsuit in state court seeking to collect its debt against the Debtors.[17] Wells Fargo claimed that the Debtors were liable for $139,750 of principal, $44,000 of interest, and at least $40,000 in attorney's fees.[18] The credit counseling group decided it could no longer assist the Debtors and remitted the money it was holding on the Debtors' behalf.[19]

---

[13] Karlinger-Smith testimony. *See also In re Karlinger-Smith*, No. 15-10214, ECF 18 (amended Schedule F).

[14] Karlinger-Smith testimony.

[15] *Id*.

[16] *Id*.

[17] Karlinger-Smith testimony; *In re Karlinger-Smith*, No. 15-10214, ECF 19, Ex. A (Wells Fargo state court complaint).

[18] *In re Karlinger-Smith*, No. 15-10214, ECF 19, Ex. A (Wells Fargo state court complaint).

[19] Karlinger-Smith testimony.

### C. The Debtors file for bankruptcy under chapter 7.

In response to the Wells Fargo lawsuit, the Debtors filed a petition for chapter 7 relief.[20] According to Dr. Karlinger-Smith's uncontroverted testimony, the Debtors were current on all their debts except the business debt to Wells Fargo.[21]

The Debtors' amended schedules reflect $442,245 of total debt.[22] No one disputes that most of this is non-consumer debt. The Debtors scheduled Wells Fargo's debt at the $223,774 claimed by Wells Fargo in its lawsuit.[23] The Debtors also listed $188,419 in secured debt related to their homestead and vehicles.[24] The Debtors stated their intent to reaffirm their auto loan and mortgage on their homestead, continue making payments without reaffirming their home equity line of credit, and surrender their leased Smart Car.[25] The remainder of their debt—$30,052—is unsecured credit card debt.[26]

The Debtors, a veterinarian and a teacher, take home $9,880 each month, and their regular monthly expenses total $7,118, which include $1,849 comprising private school tuition,

---

[20] *In re Karlinger-Smith*, No. 15-10214, ECF 1.

[21] Karlinger-Smith testimony.

[22] *In re Karlinger-Smith*, No. 15-10214, ECF 1 (original Schedules); *In re Karlinger-Smith*, No. 15-10214, ECF 18 (amended Schedule F).

[23] *See In re Karlinger-Smith*, No. 15-10214, ECF 18 (amended Schedule F).

[24] *In re Karlinger-Smith*, No. 15-10214, ECF 1, at 27 (Schedule D).

[25] *Id.* at 49-51 (Statement of Intention).

[26] *In re Karlinger-Smith*, No. 15-10214, ECF 1 (original Schedules); *In re Karlinger-Smith*, No. 15-10214, ECF 18 (amended Schedule F).

5

music lessons, sports fees, and other extracurricular activities for their two children.[27] This leaves $2,762 in monthly disposable income.[28]

### D. The U.S. Trustee seeks conversion of the Debtors' case to chapter 11.

The U.S. Trustee asserts that conversion is appropriate as the debtors have the ability to pay a substantial dividend to their creditors based on their significant disposable income. Further, the U.S. Trustee claims that the debtors are enjoying luxuries that most chapter 7 debtors cannot afford: private school tuition and extracurricular activities for their two children. If these expenses were eliminated, as might be required if the case was converted to chapter 11, the Debtors would be able to pay even more to creditors through a chapter 11 plan. The Debtors contend that the private school tuition, which is paid to Saint Dominic Savio Catholic High School, a school affiliated with the Roman Catholic Diocese of Austin, is a reflection of their deeply held religious beliefs, and therefore not a luxury expense.[29]

The Court held a hearing on the motion on September 2, 2015. The U.S. Trustee introduced the Debtors' Schedules F, I, and J, and IRS Publication 526[30] into evidence without objection from the Debtors. The Debtors called Dr. Karlinger-Smith to provide testimony, and she testified credibly as to the Debtors' efforts to repay their debt before bankruptcy. Although Wells Fargo did not intervene in the motion prior to the hearing, or offer evidence or testimony, its counsel made an appearance. The Court took the matter under advisement and invited the

---

[27] *In re Karlinger-Smith*, No. 15-10214, ECF 1, at 33-39 (Schedules I and J).

[28] *Id.* at 38.

[29] *In re Karlinger-Smith*, No. 15-10214, ECF 19, at ¶ 9 (Debtors' response to the U.S. Trustee's Motion).

[30] IRS Publication 562 covers what the IRS considers charitable expenses. This evidence was tangentially relevant to the classification of the parochial school tuition for the Debtors' children.

Debtors to consider whether a settlement with Wells Fargo was possible before the Court set a briefing schedule. At a status hearing held on November 3, 2015, counsel for the Debtors indicated that the negotiations had been unsuccessful. The Court set a briefing schedule, and the U.S. Trustee, the Debtors, Wells Fargo, and an *amicus curiae* provided briefs.[31]

## II. ANALYSIS

The US Trustee does not seek dismissal for abuse under section 707(b), which is not available because the Debtors do not have primarily consumer debts.[32] Nor does the US Trustee seek dismissal for cause under section 707(a). Instead, the U.S. Trustee seeks conversion under section 706(b) because the Debtors have disposable income. Section 706(b) allows the Court to convert a chapter 7 case to a chapter 11 case "[o]n request of a party in interest . . . ."

### A. Conversion pursuant to section 706(b) is within the discretion of the Court based on what will inure to the benefit of all parties, including the Debtors.

Unlike the detailed requirements for dismissal under section 707(b), and unlike dismissal under section 707(a), which at least requires "cause," there are no statutory standards for conversion under section 706. Only two limitations are provided: the court cannot convert to chapter 12 or 13 without the debtor's consent, and the debtor must qualify to be a debtor under the chapter to which the case is being converted.[33] Nearly 30 years ago, interpreting identical language and citing legislative history, the Fifth Circuit stated that in considering a decision to

---

[31] Mr. Michael Baumer, an attorney who frequently represents debtors in this Court, was in the courtroom for an unrelated matter and sought leave to file an amicus brief in response to the U.S. Trustee. The Court granted his request.

[32] *See* 11 U.S.C. § 707(b)(1). For this reason as well, the Debtors were not even required to fill out the majority of the means test.

[33] 11 U.S.C. § 706(c)-(d).

7

convert from chapter 7 to chapter 11, over the debtor's objection, the bankruptcy court should exercise its discretion "based on [a] determination of what will most inure to the benefit of all parties in interest."[34]

The Fifth Circuit's directive to examine the "benefit to all parties in interest" suggests not an inquiry solely into the best interests of the creditors, or even the best interests of the estate, but rather a broader inquiry into what will collectively benefit the debtor, the creditors, and any other parties with a stake in the case.[35] Thus, the decision should not be made based on the interests of any one party or class of parties.

Other cases have acknowledged this by looking at the benefits of conversion to the debtor, along with the benefits to others. In *In re Gordon*,[36] the U.S. Bankruptcy Court for the Northern District of Georgia found a benefit to the individual debtor from conversion to chapter 11 because resolving ongoing litigation, including the non-dischargeability of certain debts, was best handled in chapter 11.[37] In *In re Decker*[38] and *In re Baker*,[39] the bankruptcy courts for the District of Alaska and the Middle District of Florida respectively found that the ability to

---

[34] *Pickens v. Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142, 1161 (5th Cir. 1988) (citing H.R. REP. NO. 95-595, at 380 (1977), 1978 U.S.C.C.A.N. 5963, 6336). *See also* S. REP. NO. 95-989, at 94 (1978), 1978 U.S.C.C.A.N. 5787, 5880 ("The decision whether to convert is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest.") (containing the same language as the House Report).

[35] *Cf. In re Baker*, 503 B.R. 751, 758 (Bankr. M.D. Fla. 2013); *In re Gordon*, 465 B.R. 683, 693-94 (Bankr. N.D. Ga. 2012); *In re Decker*, 535 B.R. 828, 837-38 (Bankr. D. Alaska 2015); *In re Graham*, 21 B.R. 235, 238 (Bankr. N.D. Iowa 1982).

[36] *In re Gordon*, 465 B.R. 683 (Bankr. N.D. Ga. 2012).

[37] *Id.* at 693-94.

[38] *Decker*, 535 B.R. at 828.

[39] *Baker*, 503 B.R. at 751.

restructure significant tax debts in chapter 11 provided a benefit to the individual debtors.[40] Thus, to determine whether conversion is appropriate in this case, the Court will consider the benefit of chapter 11 to all parties, including the debtors.

In following the Fifth Circuit's instruction to look at the benefit to all parties, the Court declines to follow cases from other circuits that limit the Court's discretion. Specifically, the Court rejects the *In re Graham*[41] line of cases, which categorically decline to convert individual cases to chapter 11, either based on the legislative history regarding chapter 13 suggesting that Congress viewed involuntary payment plans as unwise, or because prior to BAPCPA, an individual debtor's postpetition earnings were not included as property of the chapter 11 estate.[42] As to the first, legislative history concerning chapter 13 is not needed to interpret section 706(b), which has its own legislative history.[43] As to the second, BAPCPA has unequivocally included postpetition earnings of individual debtors in property of the chapter 11 estate, even though chapter 11 may be involuntary.[44]

---

[40] *In re Decker*, 535 B.R. 828, 842 (Bankr. D. Alaska 2015); *In re Baker*, 503 B.R. 751, 758-59 (Bankr. M.D. Fla. 2013).

[41] *In re Graham*, 21 B.R. 235, 239 (Bankr. N.D. Iowa 1982).

[42] *Graham*, 21 B.R. at 239; *In re Brophy*, 49 B.R. 483, 484 (Bankr. D. Haw. 1985); *In re Freunscht*, 53 B.R. 110, 112 (Bankr. D. Vt. 1985) (concluding also that Congress intended section 706(b) to only apply to debtors doing business).

[43] *See* S. REP. NO. 95-989, at 94 (1978), 1978 U.S.C.C.A.N. 5787, 5880 ("The decision whether to convert is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest."); H.R. REP. NO. 95-595, at 380 (1977), 1978 U.S.C.C.A.N. 5963, 6336) (same).

[44] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109–8, § 321, 119 Stat. 23 (2005). *See also* U.S.C. § 1115(a)(2).

The Court also disagrees with the line of cases that hold that the provisions of section 707 limit the permissible application of section 706. In *In re Hardigan*,[45] the debtor was a consumer debtor but passed the means test.[46] The U.S. Trustee sought dismissal under the other "abuse" tests of section 707(b)(3) and, alternatively, conversion under section 706(b).[47] The court found the abuse tests unsatisfied, and then ruled that questions of bad faith or abuse should be decided solely under the more comprehensive provisions of section 707(b), and therefore cannot be grounds for conversion under section 706(b).[48] Similarly, in *In re Quinn*,[49] the court found that the U.S. Trustee failed to establish cause for dismissal under section 707(a).[50] Although it couched its ruling in the language of discretion, the court stated that "it is not appropriate to compel the same end result through conversion to Chapter 11 when it is not appropriate to dismiss the Chapter 7 case[,]" and on this basis denied relief under section 706.[51] Both of these cases suggest that if a case should not be dismissed under section 707(b), it cannot be converted under section 706(b). Under this reasoning, no individual debtor with primarily business debts could be forced into chapter 11.

The Court declines to add this limit to section 706. First, section 706 contains no reference to, and is therefore not expressly limited by, section 707(b). Second, section 706

---

[45] *In re Hardigan*, 490 B.R. 437 (Bankr. S.D. Ga. 2013).

[46] *Id.* at 444-45.

[47] *Id.* at 447.

[48] *Id.* at 446.

[49] *In re Quinn*, 490 B.R. 607 (Bankr. D. N.M. 2012).

[50] *Id.* at 620-21.

[51] *Id.* at 621-22.

already has two express limits: the debtor must be eligible to be a debtor in the chapter to which conversion is sought, and no debtor can be forced into a chapter 12 or 13 case.[52] The latter of these express limits is most instructive—it suggests that Congress considered whether limits should apply to forced conversion of individual debtors, and put a limit—debtor consent—on conversion to chapter 12 or 13, but did not limit conversion to chapter 11.

Nor is there any inconsistency between granting conversion under section 706(b) and refusing to dismiss under section 707(b). One governs involuntary conversion of any chapter 7 case to a chapter 11 case; the other governs dismissal of a chapter 7 case involving primarily consumer debt. Although Congress placed additional limits on the availability of chapter 7 relief to debtors with primarily consumer debts through the BAFJA and BAPCPA amendments to 707(b), neither act changed the language of section 706(b) or purported to expand or contract the eligibility of non-consumer debtors for chapter 7 relief.[53] This is not to suggest that the elements of section 707(b) are not relevant to the court's exercise of discretion under section 706. For example, the Debtors' income and ability to pay are highly relevant in determining whether conversion would benefit all parties.[54]

---

[52] 11 U.S.C. 11 § 706(b)-(c).

[53] *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, § 312, 98 Stat. 333 (1984) (adding subsection (b) to section 707, which provided for dismissal for "substantial abuse" if the debtor had primarily consumer debts); Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109–8, § 102, 119 Stat 23 (2005) (reducing the standard of section 707(b) from "substantial abuse" to "abuse" and implementing the means test). Section 101 of BAPCPA did alter section 706(c) by making it clear that a court could convert to chapter 13 instead of chapter 11 on the motion of another party in interest if the Debtor consents.

[54] The various forms of abuse that fill out section 707(b) also might well be relevant to the inquiry of what benefits the parties as a whole, but no abuse has been alleged in this case.

**B. Conversion of this case would yield no benefit to the Debtors, merely transfer value from the Debtors to their creditors, at a cost, and not inure to the collective benefit of all parties in interest.**

But here there is no evidence of any benefit to the Debtors or a net benefit to parties in interest considered as a whole. All the Court would accomplish by converting this case is the zero-sum transfer of some portion of the Debtors' future income to creditors, at the cost of the chapter 11 process. Taken as a whole, the parties in interest will be worse off. And absent some benefit to the Debtors, however small or intangible, it is difficult to see how the Debtors will be incented to work as productively as they are now for five years, when all their disposable income is being directed to creditors against their will. This is by no means a determinative factor, but it is significant. Veterinarians and teachers, like most wage-earners, work hard at their jobs and they do so to support their families and provide for their futures. This is part of the reason wage-earners cannot be forced into chapter 13.[55] And while wage-earners can be forced into chapter 11, it would be a poor exercise of discretion not to take a lack of benefit to the debtor—and concomitant lack of incentive—into consideration.

The Court could find a benefit to the Debtors if they had tax debt that could be paid out over time under section 1129(a)(9)(C).[56] But despite the failure of Dr. Karlinger-Smith's hospital venture, and their 7-year effort to repay the resulting business debt, the Debtors managed to resist the temptation to finance their debt problems by not paying taxes. Another benefit might be found in the ability to rebuild credit by crafting a debt repayment plan in chapter 11. But it is

---

[55] H. R. REP. NO.. 95-595, at 120 (1977).

[56] *See In re Decker*, 535 B.R. 828, 842 (Bankr. D. Alaska 2015); *In re Baker*, 503 B.R. 751, 758 (Bankr. M.D. Fla. 2013).

12

unclear how much a five-year chapter 11 plan will help with that goal,[57] and in any event, the Debtors will get some benefit—and in a more expedient manner—if they follow through on their stated intention to reaffirm their mortgage and car debts.[58]

The U.S. Trustee asserts two benefits to the Debtors from conversion. First, the U.S. Trustee suggests that the Debtors would have the satisfaction of paying back a portion of their debts. The Court is unconvinced of this benefit in light of the Debtors' lengthy, diligent, and for the most part successful efforts to satisfy their debts before bankruptcy. Second, the U.S. Trustee argues that chapter 11 would allow the Debtors to resolve their state court litigation with Wells Fargo and prevent litigation by their other creditors.[59] But a discharge under chapter 7 would do the same.[60]

### C. Weighing ability to pay against the likely expenses of chapter 11 litigation, the Court does not find the requisite benefit to conversion.

To be sure, the U.S. Trustee's focus on the Debtors' ability to pay makes sense as "an exceedingly relevant, if not necessary, factor and the obvious starting point for any analysis under section 706(b)."[61] That income to fund a plan exists is good; but more is required to determine whether conversion will be a benefit to all, a "futile act" leading to an inevitable

---

[57] *Cf.* Julapa Jagtiani & Wenli Li, *Credit Access After Consumer Bankruptcy*, 89 AM. BANKR. L. J. 327, 360 (Spring 2015) (empirical study finding that new lenders treated chapter 13 debtors less favorably than chapter 7 debtors).

[58] *See In re Karlinger-Smith*, No. 15-10214, ECF 1, at 49-51 (Statement of Intention).

[59] *See In re Karlinger-Smith*, No. 15-10214, ECF 28, at 3 (U.S. Trustee's brief in support).

[60] *See* 11 U.S.C. § 525(a).

[61] *In re Decker*, 535 B.R. 828, 839 (Bankr. D. Alaska 2015); *accord In re Schlehuber*, 489 B.R. 570, 574 (B.A.P. 8th Cir. 2013), *aff'd*, 558 F. App'x 715 (8th Cir. 2014); *In re Baker*, 503 B.R. 751, 757 (Bankr. M.D. Fla. 2013); *In re Gordon*, 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012).

reconversion to chapter 7, or somewhere in between.[62] And the expenses of the Debtors and creditors would determine how much of the possible benefit of conversion is actually realized.[63] Of course, the U.S. Trustee should not be required, during the conversion hearing, to prove that a plan can be confirmed or provide an exact cost estimate, but some evidence of what a chapter 11 case would look like is required.

Fortunately, the record here provides some evidence of what would happen in a chapter 11 case. Before the briefing schedule was set in this matter, the Debtors agreed to negotiate with Wells Fargo, and those negotiations failed, just as the credit counseling group failed in its prepetition negotiations with Wells Fargo. It therefore seems likely that Wells Fargo will be an active player in any chapter 11 case, and that litigation in the case will focus on how the Debtors treat Wells Fargo in the plan. The designation of private school tuition as a charitable contribution will be in play, as will the many issues that are unresolved under the relatively undeveloped chapter 11 provisions that apply to individuals.[64] During the next five years, the Debtors' older son will start college. No doubt Wells Fargo will have something to say about the amount of money allocated to that activity and to any of the other new expenses faced by this family during that time.[65]

---

[62] *In re Decker*, 535 B.R. 828, 840 (Bankr. D. Alaska 2015) (citing *In re Gordon*, 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012); *In re Hardigan*, 490 B.R. 437, 446 (Bankr. S.D. Ga. 2013)).

[63] *See In re Watkins*, 132 B.R. 781, 782 (Bankr. S.D. Fla. 1991).

[64] Candice Manyak, *Post-BAPCPA Perils of Representing Individual Chapter 11 Debtors*, 33 AM. BANKR. INST. J. at 62 (Mar. 2014); David Jennis, *How Disposable Is Your Individual Chapter 11 Debtor's Income?*, 30 AM. BANKR. INST. J. at 65 (Oct. 2011); Walter W. Theus, Jr., *Individual Chapter 11s: Case Closings Reconsidered*, 29 AM. BANKR. INST. J. at 61 (Feb 2010).

[65] In some jurisdictions, the costs associated with individual chapter 11 cases have been mitigated by uniform plan and disclosure statement forms, similar to the chapter 13 plan form used in this and other courts. *See generally*, *e.g.*, *Chapter 11 Plan*, http://www.cacb.uscourts.gov/forms/chapter-11-plan (form chapter 11 plan for the

Wells Fargo helpfully suggests in its reply brief that it would not object to the Debtors' current budget in a chapter 11 plan and would vote affirmatively for any plan that comports with the Bankruptcy Code.[66] But that only begs the question of what the Bankruptcy Code requires in individual chapter 11 cases. If all or even a few of the undeveloped individual chapter 11 issues have to be litigated, the resulting fees and expenses incurred by the Debtors, and by Wells Fargo, may be disproportionate to the benefit, if any, derived from transferring future income from the Debtors to Wells Fargo.

### III. CONCLUSION

These Debtors responsibly, diligently, and successfully paid much of their business debt outside bankruptcy, and at no small personal sacrifice. The Debtors paid their taxes on time and in full. Of all their business creditors, only Wells Fargo remained unsatisfied by the Debtors' efforts, and only Wells Fargo resorted to the prepetition lawsuit that pushed the Debtors into bankruptcy. And yet, Wells Fargo did not join the U.S. Trustee's motion and offered no evidence in support of that motion.[67] Under these unusual circumstances, the Court is unable to find the requisite benefit inuring to all parties in interest that would support conversion to chapter 11. For these reasons, the Court will deny the U.S. Trustee's motion to convert through separate order.

---

Central District of California). But no such forms exist for this district or division; indeed, so few individual chapter 11 cases are filed here that the effort may not yet be justified.

[66] *In re Karlinger-Smith*, No. 15-10214, ECF 36, at ¶ 4.

[67] This is not to suggest that the Court discounts the U.S. Trustee's role as a party in interest. The U.S. Trustee's voice is one heard keenly by this Court, and this Court appreciates the U.S. Trustee's active role in this and all other cases before the Court.